1
2
3
4
5
6
7
8                         UNITED STATES DISTRICT COURT
9                          Northern District of California
10                           San Francisco Division
11   MARY HUSS,                              No. C 14-02299 LB
12                  Plaintiff,               **ORDER GRANTING IN PART AND
                                             DENYING IN PART PLAINTIFF'S
13        v.                                 MOTION FOR SUMMARY
                                             JUDGMENT, DENYING
14   CAROLYN W. COLVIN,                      DEFENDANT'S MOTION FOR
     Acting Commissioner of Social Security, SUMMARY JUDGMENT, AND
15                                           REMANDING FOR FURTHER
                  Defendant.                 PROCEEDINGS.**
16   _____/
                                             [Re: ECF Nos. 13 and 14]
17
                              **INTRODUCTION**
18
        On May 19, 2014, Mary Huss filed a complaint against the acting Commissioner of Social
19
     Security, Carolyn Colvin, seeking judicial review of the Commissioner's final decision denying her
20
     claim for disability benefits for her claimed disabilities caused by a combination of physical and
21
     psychological maladies.  (Complaint, ECF No. 1.[1])  The Administrative Law Judge ("ALJ") found
22
     that Ms. Huss had the residual functional capacity to perform her past relevant work as a
23
     caseworker.  (Administrative Record ("AR") 18-22.)  Now, Ms. Huss and the Commissioner both
24
     move for summary judgment.  (Motion, ECF No. 13; Cross-Motion and Opposition, ECF No. 14.)
25
     All parties have consented to the court's jurisdiction.  (ECF Nos. 8, 9.)  Pursuant to Civil Local Rule
26

27   _____
            [1] Record citations are to documents in the Electronic Case File ("ECF"); pinpoint citations
28   are to the ECF-generated page numbers at the top of the documents.

UNITED STATES DISTRICT COURT
For the Northern District of California

16-5, the matter is deemed submitted for decision by this court without oral argument.  For the reasons stated below, the court grants in part and denies in part Ms. Huss's motion, denies the Commissioner's motion, and remands this case to the Social Security Administration for further proceedings.

## STATEMENT

## I.  PROCEDURAL HISTORY

Ms. Huss, who was born on February 7, 1951, applied for disability insurance benefits and supplemental security income on December 30, 2009.  (AR 107-08.)  In both applications, she alleged that her disability began on August 15, 2008.  The Commissioner denied Ms. Huss's claims initially on June 24, 2010, and upon reconsideration on July 6, 2011.  (AR 114, 121.)  On August 3, 2011, Ms. Huss requested a hearing before an ALJ.  (AR 126.)

ALJ Philip Lyman conducted a hearing on May 29, 2012 in San Jose, California.  (AR 29-80.)  Ms. Huss was represented by attorney Angelina Valle.  (AR 29.)  Ms. Huss, vocational expert Ronald Morrell, and psychological expert Tracy Gordy testified.  (AR 29.)  On June 14, 2012, the ALJ issued his decision that Ms. Huss was not disabled under the Social Security Act.  (AR 11-23.)  On April 15, 2014, the Appeals Council denied Ms. Huss's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 1-3.)

On April 19, 2014, Ms. Huss filed the complaint in this action.  (Complaint, ECF No. 1.)  Ms. Huss filed a motion for Leave to Proceed *in forma pauperis*, which the court granted on April 29, 2014.  (Motion, ECF No. 3; Order, ECF No. 5.)  The Commissioner answered the complaint on September 8, 2014.  (Answer, ECF No. 11.)  Ms. Huss moved for summary judgement on October 6. 2014.  (Motion, ECF No. 13.)  The Commissioner responded with a cross-motion for summary judgement and opposition to Ms. Huss's motion on November 4, 2014.  (Cross-Motion and Opposition, ECF No. 14.)  Ms. Huss filed her reply on November 17, 2014.  (Reply, ECF No. 15.)

## II.  SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS

This section summarizes the medical evidence in the administrative record from (A) Ms. Huss's treating physicians, (B) her non-treating physicians, (C) the hearing testimony, and (D) the ALJ's findings.

UNITED STATES DISTRICT COURT
For the Northern District of California

**A.  Medical Evidence: Treating Physicians**

*1. Dr. Robert Wlodarczyk, D.O. (March 12 and June 10, 2008)*

Notes from Ms. Huss's two physical exams with Dr. Robert Wlodarczyk on March 12 and June 10, 2008 were generally unremarkable indicating morbid obesity, diabetes, sleep apnea, fibromyalgia, and allergies.  (AR 290-93.)  The only legible symptom mentioned in the notes is congestion.  (AR 291.)  Dr. Wlodarczyk recommended diet and weight loss, use of a CPAP, and Zyrtec.  (AR 291.)

*2. Dr. B. Elene Brandt, M.D.  (March 3, 2008 - March 16, 2010)*

The record includes Dr. Elene Brandt's notes from 22 routine physical exams over two years between March 2008 and March 2010.  (AR 335-56.)  During exams conducted in early and mid-2008 Ms. Huss reported shoulder pain, vomiting, sore throat, and fever, and Dr. Brandt noted the possible need for hand surgery.  (AR 351-53.)  Ms. Huss was briefly hospitalized in early July 2008, as discussed below, but this visit is not mentioned in Dr. Brandt's notes from the same time period. (AR 342-50.)   Dr. Brandt noted that Ms. Huss's diabetes and hypertension were well controlled. (AR 340, 342, 350.)  During the period from late 2008 until the notes end in March 2010, Ms. Huss had a number of spells of bronchitis (AR 336, 339, 341, 349), an asthma attack brought on by stress at home (AR 348), and bruising from falling at the grocery store (AR 345).  In an exam on August 2, 2008 Ms. Huss reported working only two days a week because funding had been cut for her position.  (AR 348.)  Her boss recommended that she apply for disability.  (AR 348.)  During exams in late 2009 Ms. Huss began reporting severe abdominal pain and Dr. Brandt told her to go to the hospital and ask for MediCal.  (AR 337.)  Dr. Brandt noted on Ms. Huss's last three visits in early 2010 that Ms. Huss needed a colonoscopy.  (AR 335 and 336.)

*3. Salinas Valley Memorial Hospital. (July 6 - 8, 2008)*

On July 7, 2008, Ms. Huss went to Salinas Valley Memorial Hospital complaining of slurred speech, facial drooping, and slight frontal headache.  (AR 306.)  Her son took her to the hospital after she had been shopping at Target in the morning.  (AR 300.)  At the hospital, numerous physicians, including Dr. Brandt, treated and examined Ms. Huss.  (AR 294-333.)  Dr. Rakesh Singh did not notice any slurred speech and noticed only a slight facial droop, which resolved itself.  (AR

UNITED STATES DISTRICT COURT
For the Northern District of California

1    307.)  A chest x-ray showed no acute disease, and a CT scan of Ms. Huss's head showed probable

2    small chronic ischemic change with no clear evidence of acute ischemia.  (AR 302.)  Consulting

3    neurologist Dr. Wayne Shen reported that her EKG was normal and her CT scan was unremarkable.

4    (AR 299.)  Dr. Shen further stated that Ms. Huss's very minimal symptoms were cerebrovascular in

5    nature and recommended a MRI and further testing.  (AR 299.)  Dr. Robert Wlodarczyk reviewed

6    the MRI results and found "cerebral white matter changes most compatible with chronic deep white

7    matter ischemia," but did not identify any "acute intra cranial pathology."  (AR 295-96.)  He

8    recommended Ms. Huss start taking aspirin, begin dieting to lose weight, and consider using a

9    BiPAP or CPAP mask for her sleep apnea.  (AR 296.)  Dr. Brandt diagnosed Ms. Huss with left

10   lower lung scarring, diabetes, metabolic syndrome, hypertension, sleep apnea, asthma, and a trigger

11   finger.  (AR 300.)  Dr. Brandt treated her for hypercholesterolemia but believed her diabetes and

12   blood pressure were under control.  (AR 302.)

13          *4.  Letter from Dr. B. Elene Brandt, M.D.  (March 19, 2010)*

14          In a letter addressed "To Whom It May Concern," Dr. Brandt stated that Ms. Huss ended

15   treatment because she "can not afford medical care or evaluation."  (AR 359.)  Dr. Brandt declared

16   Ms. Huss to be "disabled because I have serious concerns about her health."  (AR 359.)

17   Nonetheless, this evaluation was "not about orthopedic concerns or how long she can stand or sit."

18   (AR 359.)   Rather, Dr. Brandt opined that Ms. Huss might have "colon cancer or MS."  (AR 359.)

19   Dr. Brandt stated later that she has not performed a colonoscopy or brain MRI.  (AR 359.)  She also

20   stated that Ms. Huss has diabetes, hypertension, and COPD[2] with asthma.  (AR 359.)

21          *5.  Natividad Medical Center. (November 14 and December 28, 2010)*

22          On November 14, 2010, Ms. Huss went to Natividad Medical Center for treatment of a

23   laceration on her right index finger.  (AR 448.)  On December 28, 2010, Ms. Huss went to Natividad

24   Medical Center a second time for treatment of a head injury.  (AR 434.)  Dr. Craig Walls described

25   the injury as not serious but cautioned that Ms. Huss should watch for warning signs of more serious

26   injury.  (AR 434.)  Dr. Walls was concerned that the injury was the result of domestic abuse.  (433.)

27

28          _____

            [2] COPD is an abbreviation for chronic obstructive pulmonary disease.

### 6.  Dr. Laura M Solorio, M.D., Laurel Family Practice (December 6, 2010)

Ms. Huss visited Dr. Laura Solorio at the Laurel Internal Medicine Clinic for the first time on December 6, 2010.  (AR 475.)  Dr. Solorio conducted a new patient physical exam which revealed mostly normal results with mild tenderness of the abdomen and soft nodules on her left hand.  (AR 476.)  Dr. Solorio determined that Ms. Huss's ailments included diabetes without complication type II, COPD, unspecified essential hypertension, unspecified vitamin D deficiency, and abdominal pain.  (AR 476-77.)

### 7.  Dr. Laura M Solorio, M.D., Laurel Family Practice (January 11, 2011)

On January 11, 2011, Dr. Solorio noted that Ms. Huss went to the ER in December after an assault by her daughter and she was told everything was ok.  (AR 473.)  Ms. Huss also mentioned a bad root canal she had on an upper left tooth that was starting to become sore and possibly infected.  (AR 473.)  Dr. Solorio did not note any tooth swelling or pus, but did observe tenderness over the area over the left cheek.  (AR 473.)  Additional physical examination revealed nothing abnormal.  (AR 473-74.)

### 8.  Dr. Laura M Solorio, M.D., Laurel Family Practice (February 8, 2011)

On February 8, 2011, Dr. Solorio noted that Ms. Huss had visited a dentist since her last exam and had a decayed root pulled from her right side.  (AR 471.)  Ms. Huss reported no pain.  (AR 472.)  Dr. Solorio conducted a physical exam that did not reveal any abnormal results.  (AR 472.)  Ms. Huss's diabetes, COPD, and hypertension were still under control.  (AR 472.)

### 9.  Dr. Laura M Solorio, M.D., Laurel Family Practice (March 10, 2011)

In an exam on March 10, 2011, Ms. Huss reported to Dr. Solorio significant pain in her shoulder.  (AR 469.)  The results of a "basic metabolic panel calcium total" revealed results all within the normal range.  (AR 470.)  Dr. Solorio added arthritis to her list of diagnoses.  (AR 470.)

### 10.  Dr. Laura M Solorio, M.D., Laurel Family Practice (April 26, 2011)

On April 26, 2011, Ms. Huss reported that her blood pressure medication makes her cough so she had started taking it in the morning instead of at night.  (AR 466.)  Ms. Huss also complained of minor shoulder pain.  (AR. 466.)  Dr. Solorio's physical exam revealed nothing abnormal.  (AR 466-67.)  Lab results were all within normal ranges.  (AR 467.)  Dr. Solorio added degenerative joint

UNITED STATES DISTRICT COURT
For the Northern District of California

1  disease and joint pain to Ms. Huss's ailments.  (AR 468.)

2  ### 11.  *Dr. Laura M Solorio, M.D., Laurel Family Practice (June 3, 2011)*

3  On June 3, 2011, Ms. Huss reported to Dr. Solorio that she had completed her dental work with

4  an oral surgeon and all her dental ailments had been resolved.  (AR 464.)  Ms. Huss complained of

5  level 3 back pain.  (AR 464.)  Dr. Solorio's physical exam and pelvic exam of Ms. Huss revealed

6  nothing abnormal.  (AR 464-65.)  Ms. Huss's mammogram and cervical cancer screening both came

7  back negative, but Dr. Solorio did diagnosed Ms. Huss with Dysuria.  (AR 465.)

8  Additionally, Dr. James Kowalski, MD, consulted on films taken of Ms. Huss's right hand

9  finding that she had some "subchondral cystic change of the waist of the carponavicular bone best

10  result of old trauma. Minor osteoarthritic spurring noted of the interphalangeal joint of the thumb.

11  Less prominent spur formation noted of the DIP joint of the 2nd and 5th digits.  No evidence for any

12  erosive change, sclerosis, fracture, or dislocation." (AR 462.)  Dr. Kowalski concluded "[m]inimal

13  osteoarthritic change is noted of the right hand. No evidence for recent osseous injury." (AR 462.)

14  ### 12.  *Dr. Laura M Solorio, M.D., Laurel Family Practice (July 1, 2011)*

15  On July 1, 2011, Ms. Huss visited Dr. Solorio stating that she had kicked the vacuum cleaner the

16  previous day.  (AR 614.)  Ms. Huss did not experience any pain until it woke her at 3 am.  (AR 614.)

17  Dr. Solorio noted "very mild swelling" on her right foot and "tenderness to palpation."  (AR 614.)

18  An x-ray revealed no fracture to be present.  (AR 614.)

19  ### 13.  *Dr. Laura M Solorio, M.D., Laurel Family Practice (August 3, 2011)*

20  On August 3, 2011, Ms. Huss visited Dr. Solorio complaining of "chest pain when she feels very

21  nervous." (AR 612.)  She described it as "like I'm having a panic attack." (AR 612.)  Ms. Huss also

22  reported failing to use her CPAP as advised in order to treat her sleep apnea.  (AR 612.)  Dr. Solorio

23  diagnosed her with obstructive sleep apnea and referred her for a cardiac stress test.  (AR 613.)

24  ### 14.  *Alma C. Ritsema, Laurel Family Practice (August 17, 2011)*

25  On August 17, 2011, Ms. Huss visited Ms. Alma Ritsema complaining of stress and depression.

26  (AR 603.)  Ms. Ritsema diagnosed Ms. Huss as having "major depressive disorder, recurrent

27  episode, moderate." (AR 603.)  Ms. Ritsema also assigned Ms. Huss a GAF score of 55.  (AR 606.)

28  Additionally, Ms. Ritsema switched Ms. Huss from Effexor to Wellbutrin in order to treat her

1  depression.  (AR 607.)  Finally, Ms. Ritsema referred Ms. Huss "to Luz for counseling." (AR 606.)

2      *15.  Dr. Laura M. Solorio MD, Laurel Family Practice (September 8, 2011)*

3      On September 8, 2011, Ms. Huss reported improved chest pain, "but still has 'panic' attack

4  associated with it."  (AR 601.)  Dr. Solorio noted that Ms. Huss visited Ms. Ritsema to try "to deal

5  with stressors in her life."  (AR 601.)  Ms. Huss reported not being able to tolerate the change from

6  Effexor to Welbutrin.  (AR 601.)  Blood test results were all within the normal range.  (AR 601-02.)

7  Dr. Solorio wanted to conduct a stress test to further investigate Ms. Huss's chest pain.  (AR 602.)

8      *16.  Luz Venegas LCSW, Laurel Family Practice (September 13, 2011)*

9      On September 13, 2011, Ms. Venegas, a Licensed Clinical Social Worker, conducted and Initial

10  Referral Assessment Mental Status Exam with Ms. Huss to help develop "coping strategies around

11  family boundaries."  (AR 600.)  Ms. Venegas introduced Ms. Huss to "the concept of self-care . . . ."

12  (AR 600.)  Ms. Venegas noted state that she "could not focus and wanted to share some of her own

13  self-care techniques." (AR 600.)

14      *17.  Alma C. Ritsema, Laurel Family Practice (September 15, 2011)*

15      On September 15, 2011, Ms. Huss reported to Ms. Ritsema not being able to tolerate the

16  Welbutrin and that she switched back to taking Effexor.  (AR 596.)  She said it gave her nausea, her

17  head felt "big," and she started hearing voices.  (AR 596.)  Ms. Huss was attempting to set

18  boundaries at home.  (AR 596.)

19      *18.  Alma C. Ritsema, Laurel Family Practice (October 13, 2011)*

20      On October 13, 2011, Ms. Huss told Ms. Ritsema that she had a colonoscopy the previous week.

21  (AR 593.)  Results of the first sleep study indicated that she has severe sleep apnea.  (AR 593.)  Ms.

22  Huss believed that her poor sleep is a "big contributor" to her depression.  (AR 593.)  Ms. Huss also

23  reported significant difficulties with family members at home.  (AR 593.)

24      *19.  Dr. Laura M. Solario MD, Laurel Family Practice (December 20, 2011)*

25      The sleep study revealed that Ms. Huss had an AHI of 53 but she began using the CPAP and

26  reported being able to sleep through the night.  (AR 589.)  In an exam with Dr. Solorio on December

27  20, 2011, Ms. Huss reported that her granddaughter has some kind of neurological disorder and this

28  has increased her stress.  (AR 589.)  Ms. Huss complained of epigastric pain when she takes

1   meloxicam; Dr. Solario proscribed omeprazole to compensate.  (AR 589.)  Ms. Huss also

2   complained about pelvic discomfort and malodorous urine.  (AR 589.)  Urinalysis reports indicated

3   that she had no abnormalities.  (AR 591.)

4       ***20.  Alma C. Ritsema, Laurel Family Practice (December 21, 2011)***

5       On December 21, 2011, Ms. Huss reported significant problems and stress in dealing with her

6   daughters.  (AR 587.)  They were emotionally and verbally abusive with her.  (AR 587.)  She had

7   continued to use the CPAP machine and had seen significant improvement in her sleep.  (AR 587.)

8   **B.  Medical Evidence: Non-Treating Physicians**

9       ***1.  Dr. Tam Nguyen, M.D. (May 4, 2010)***

10      Due to the scarcity of medical history, the Social Security Administration had Dr. Tam Nguyen

11  examine Ms. Huss in May 2010.  (AR 360-64.)  Dr. Nguyen's report states that Ms. Huss's chief

12  complaint was generalized joint pain, which had been continuous for ten years.  (AR 360.)  Ms.

13  Huss described it as a "dull pain" particularly in her knees, elbows, neck, hands, and shoulders.  (AR

14  360.)  According to Ms. Huss, the pain had gotten worse over the years, and her doctor had informed

15  her that it was due to arthritis.  (AR 360.)  She said the pain was exacerbated by movements and

16  prolonged standing but was relieved by rest and pain medications.  (AR 360.)

17      However, Ms. Huss reported that this pain had "no impact on activities of daily living."  (AR

18  360.)  She routinely played with her granddaughter and took care of all her own personal needs as

19  well as housework and some yard work.  (AR 360.)

20      Dr. Nguyen observed that Ms. Huss was able to "walk to the exam room without assistance," "sit

21  comfortably," "get up and off the table," "took off her shoes and put them back on normally," and

22  "did not appear [] in any acute distress."  (AR 361.)  Dr. Nguyen did note that she was obese.  (AR

23  361.)

24      After a routine physical exam, Dr. Nguyen concluded that the joint pain was due to stable

25  osteoarthritis.  (AR 363.)  Dr. Nguyen also found Ms. Huss to have diabetes mellitus and

26  asthma/COPD without any complications.  (AR 363.)  Dr. Nguyen found no signs of congestive

27  heart failure.  (AR 363.)  Dr. Nguyen concluded that Ms. Huss had no functional limitations and did

28  not need any assistive devices.  (AR 364.)

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

### 2. Dr. Pauline Bonilla, Psy. D. (May 9, 2010)

On May 9, 2010, Dr. Pauline Bonilla conducted a comprehensive psychological evaluation at the request of the Social Security Administration.  (AR 365-71.)  Dr. Bonilla diagnosed Ms. Huss with major depressive disorder and posttraumatic stress disorder and assigned her a GAP score of 63.  (AR 369.)  Dr. Bonilla noted that Ms. Huss's symptom severity appeared to be in the moderate range.  (AR 370.)  Also, Dr. Bonilla believed that Ms. Huss had an excellent chance of improvement within 12 months with treatment.  (AR 370.)

Dr. Bonilla made the following functional assessments of Ms. Huss's ability: perform simple and repetitive tasks – fair; perform detailed and complex tasks – poor; accept instructions from a supervisor – good; interact with coworkers and the public – good; sustain an ordinary routine without special super vision – fair; maintain regular attendance in the workplace – fair; complete a normal workday/workweek without interruptions from a psychiatric condition – poor; deal with stress and changes encountered in the workplace – poor; likelihood of emotionally deteriorating in a work environment – moderate.  (AR 370.)

Additionally, Ms. Huss reported being able to independently take care of herself and others at home.  (AR 369.)  Although she would tire easily, Ms. Huss reported that she was able to cook simple meals, engage in light chores, run errands, drive, and grocery shop.  (AR 369.)  For hobbies and leisure, Ms. Huss reported playing computer games, cards, reading, doing crossword puzzles, spending time with her grandchildren, and visiting with her family.  (AR 369.)

### 4. Dr. Kim Goldman, Psy. D. (May 12, 2011)

On May 12, 2011, Dr. Kim Goldman conducted a comprehensive psychological evaluation at the request of the Social Security Administration.  (AR 507-11.)  As reflected in the notes, Ms. Huss drove herself to the exam and was able to fill out the forms without assistance.  (AR 507.)  Ms. Huss reported her chief psychological complaints to be depression, anxiety, memory problems, speech problems, and a stroke.  (AR 507.)  She also reported suffering from diabetes, high blood pressure, RA, lupus, and strokes.  (AR 508.)

Ms. Huss reported having a driver's licence and being able to drive without restrictions.  (AR 508.)  She was able to groom and dress herself without assistance.  (AR 508.)  Ms. Huss stated that a

1   typical day for her included holding her 3-month-old grandson, going to appointments and the

2   grocery store with her daughter, playing computer games and word puzzles, and cooking and

3   helping with housework.  (AR 508.)

4       Dr. Goldman ultimately found that Ms. Huss had a "mood disorder due to a general medical

5   condition with depressive features."  (AR 511.)  Dr. Goldman assigned her a GAF score of 63.  (AR

6   511.)  Dr. Goldman determined that Ms. Huss was capable of managing funds in her own best

7   interests.  (AR 511.)  Ms. Huss's functionality was mildly to moderately impaired due to her

8   depression.  (AR 511.)

9       Dr. Goldman made the following functional assessments of Ms. Huss's abilities: understand,

10   carry out, and remember simple instructions – not impaired; understand, carry out, and remember

11   detailed instructions and complex tasks – mildly to moderately impaired; respond appropriately to

12   coworkers, supervisors, and the public – mildly to moderately impaired; respond appropriately to

13   usual work situations – mildly to moderately impaired; deal with changes to a routine work setting –

14   mildly to moderately impaired.  (AR 511.)

15       **5.  *Dr. Roger Wagner, MD (May 26, 2011)***

16       On, May 26, 2011, Dr. Roger Wagner conducted a comprehensive internal medicine evaluation

17   at the request of the Social Security Administration.  (AR 512-17.)  As reflected in Dr. Wagner's

18   notes, Ms. Huss's chief complaints were (1) diabetes mellitus type II, (2) chronic obstructive

19   pulmonary disease, (3) history of transient ischemic attack, and (4) thoracic and upper back pain.

20   (AR 512.)  Additionally, Ms. Huss reported being able to perform the activities of daily living

21   without assistance.  (AR 513.)  She would do some light cooking, cleaning, drives, and would go to

22   the grocery store.  (AR 513.)

23       Dr. Wagner noted that Ms. Huss has "mild inspiratory and expiratory wheezing throughout all

24   lung fields and mild tightness, however [she] was moving air reasonably well without any significant

25   problems."  (AR 514.)  Otherwise, the physical exam revealed no significant abnormalities.  (AR

26   514-16.)  Dr. Wagner diagnosed Ms. Huss with diabetes, asthma, thoracic back pain, and COPD.

27   (AR 516.)  Additionally, Dr. Wagner noted a history of possible transient ischemic attacks, but

28   found no evidence or residual symptoms, and he thought the history provided could also be

1   diagnosed as a panic attack. (AR 516.)

2      Based on the findings from the exam, Dr. Wagner also made a number of functional assessment

3   determinations regarding Ms. Huss's ability to work and limitations she had.  (AR 516-17.)  He

4   determined Ms. Huss had a maximum standing and walking capacity of up to six hours.  (AR 516.)

5   Her maximum sitting capacity had no limitations with normal breaks and an assistive device was not

6   necessary.  (AR 516.)  Ms. Huss had a maximum lifting/carrying capacity of 50 pounds occasionally

7   and 25 pounds frequently.  (AR 517.)  She had no postural or manipulative limitations.  (AR 517.)

8   She could not work in environments around chemicals, dust, fumes, or gases because of her COPD.

9   (AR 517.)

10      ***6.  Sleep Medicine Center - Salinas Valley Memorial Center (September 15, 2011)***

11      The Sleep Medicine Center conducted a sleep study on September 15, 2011, which confirmed

12   Ms. Huss's sleep apnea. (AR 578.)  Results included "abnormal nocturnal polysomnogram due to

13   moderately severe obstructive sleep apnea with an overall apnea-hypopea index of 36 events per

14   hour and desaturations to a nadir of 82%."  (AR 578.)  Additionally, the report noted is "mildly

15   arousing periodic limb movements."  (AR 578.)  Recommendations included positive pressure

16   titration.  (AR 578.)

17      ***7.  Sleep Medicine Center - Salinas Valley Memorial Center (October 20, 2011)***

18      The Sleep Medicine Center conducted a second sleep study on October 11, 2011, using the

19   positive pressure titration recommended in the results of the first study.  (AR 573.)  The results of

20   this study recommended using a CPAP in order to ameliorate Ms. Huss's apneas.  (AR 575.)  If that

21   treatment was insufficient, Ms. Huss could also have used a bilevel pressure device.  (AR 575.)

22   **C.  Administrative Hearing (May 29, 2012)**

23      *1. Ms. Huss*

24      In response to questions from the ALJ, Ms. Huss testified that she drives her car most days on

25   short errands and she tries to use her computer every day that her hands do not hurt too much.  (AR

26   42-43.)  She stated that the pain in her hands is from arthritis bilaterally as well as knots in her hands

27   and fingers.  (AR 43.)  Ms. Huss was employed for almost ten years at Kinship Center Family Ties

28   as a caseworker until August 2008.  (AR 43-44.)  She has not been employed since that time.  (AR

UNITED STATES DISTRICT COURT
For the Northern District of California

46.)  Previously, she worked as a bartender and assistant manager at Denny's.  (AR 44-45.)

Ms. Huss stated that she suffered from depression, which she attributed to stress at home living in her son's house, with her youngest daughter and six-month-old grandson.  (AR 49-50.)  Ms. Huss explained that her three daughters physically and mentally abuse her, causing her to be depressed. (AR 66.)  At the time of the hearing, Ms. Huss was still seeing Ms. Alma C. Ritsema for psychological treatment of her depression.  (AR 46.)  Her attorney identified Ms. Ritsema as a psychiatric nurse practitioner.  (AR 47.)

In addition to her depression and arthritis in her hands, Ms. Huss said she was limited in work she could perform because of pain from a neck fusion she underwent in 1997.  (AR 50.)  Ms. Huss also reported having problems with her intestines, migraine headaches, a disc protrusion in her lower back, and arthritis in her right knee.  (AR 51-53.)  The disc protrusion causes her back pain and prevents her from being able to sit or stand for long periods.  (AR 53.)  Ms. Huss estimated that with her combined ailments, she could not lift more than ten pounds.  (AR 51.)

Ms. Huss also suffered from documented sleep apnea. (AR 67-68.)  Using a CPAP machine had alleviated some of her sleep apnea symptoms and improved her ability to sleep.  (AR 71.) Nonetheless, Ms. Huss still had trouble sleeping through the night because she often wakes up in pain from being in a single position for too long.  (AR 71.)

In response to a question from the ALJ asking whether she could return to work as a caseworker, Ms. Huss stated, "I would try to go back but I don't know if I can make it or not . . . ."  (AR 67.) She was worried about her ability to type because of the arthritis in her hands.  (AR 67.)  Given that most caseworker now take laptops into people's home, she was also worried about being able to lift the laptop all day.  (AR 67.)

### 2. Dr. Tracy Gordy, Psychological Expert

Dr. Tracy Gordy also testified at the hearing as a psychological expert who never examined Ms. Huss.  (AR 33.)  The ALJ began by asking Dr. Gordy what documents he received in this case.  (AR 33-34.)  Dr. Gordy stated that he had not received Exhibit B31F (AR 579-614) (which contains six months of treatment records from Dr. Solorio and Ms. Ritsema) in his electronic copy of the record. (AR 34.)  After a confused discussion between Ms. Huss's attorney, the ALJ, and Dr. Gordy, Ms.

Huss's attorney misidentified Exhibit B31F as a "diabetes questionnaire" relating only to "physical impairment." (AR 34-35.) The ALJ specifically whether any "of the documents in 31 are psychiatrist or psychologist?" (AR 36.) In response Ms. Huss's attorney incorrectly answered, "No; Dr. Solario is internal medicine." (AR 36.) The ALJ relied on the representation of the attorney that Exhibit B31F did not include psychiatric nor psychological evidence to allow Dr. Gordy to testify without the whole record. (AR 35-36.)

Dr. Gordy evaluated three listings of impairments: 12.02 (organic mental disorders), 12.04 (affective disorders), and 12.06 (anxiety-related disorders). (AR 36.) Based on the documents that he had, Dr. Gordy determined that none of Ms. Huss's impairments met or equaled "any listing of the commissioner, either individually or in combination." (AR 36.) Dr. Gordy testified that "from the psychiatric standpoint ADL's would be mild; her social and her pace and concentration are both moderate, and she has no decompensations from a psychiatric standpoint during the time period." (AR 37.)

The ALJ questioned Dr. Gordy about the MRI from Ms. Huss's August 2008 hospitalization, specifically the severity of the "deep, white matter ischemia." (AR 37.) Dr. Gordy testified that it was "questionable if she really had what's called a cerebrovascular accident." (AR 37.) Dr. Gordy said the MRI results were the "subjective impression of the radiologist and there's no actual paralysis." (AR 38.)

In response to a question from Ms. Huss's attorney, Dr. Gordy stated that according to the history, Ms. Huss had two episodes of slurred speech and facial droop, but "there's no . . . evidence because all you have is what's seen in the white matter." (AR 40.) Dr. Gordy went on to say that "white matter disease is something that . . . nobody really knows exactly what you do with it." (AR 40.)

Dr. Gordy also testified that Ms. Huss had significant memory impairments based on Dr. Goldman's findings in Exhibit B19F (AR 507-11). (AR 40-41.) Ms. Huss's working memory of 83 would indicate that "she would not ne able to [do] detailed or complex kind of instructions, but could do simple, kind of straightforward things." (AR 41.)

### 3. Ronald Morrell, Vocational Expert

1      Vocational expert Ronald Morrell also testified at the administrative hearing.  (AR 71-79.)  The

2  ALJ began questioning by posing the following hypothetical:

3          [A] person of claimant's age, education, and vocational history, and assume a lift and
           carry of less than 10 pounds occasionally; a stand and walk of less than two hours a day,
4          a sit of less than six hours a day; posturally stairs and ramps are occasionally possible,
           ladders, scaffolds, and ropes are never; balance is occasional, stoop, crouch, kneel, and
5          crawl are occasional; crawl is occasional; attendance: this person will miss more than
           two times a month from attendance and scheduled breaks up to an hour per day.
6          Manipulative limitations of reaching, handling and fingering are all occasional
           bilaterally, communications limitations: there are none in hearing, seeing, and speaking;
7          environmentally according to what I've got here from the doctor Solario avoid all
           exposure to cold and heat, wet, noise, vibration, fumes, and dust, presumably that means
8          no heights, no machinery. And mental and emotional limitations: understanding and
           remembering short, simple, instruction are slightly limited; carrying out short, simple
9          instructions are slightly limited; understanding and remembering detailed, moderately
           limited, carrying out detailed instructions moderately limited. Moderate means cannot
10         performs the function up to 10 percent of the day each day; making judgements about
           simple, work related decisions is slight, interacting with supervisors is s[l]ight,
11         interacting with co-workers is slight; respond appropriately to work place pressures is
           moderate, and responding appropriately to changes in the workplace is moderate.

12

13  (AR 71-72.)  Mr. Morrell testified that under those hypothetical limitations, a person would not be

14  able to perform the prior work of Ms. Huss.  (AR 73.)  Such a hypothetical person would not have

    transferable skills and would not be able to find alternative work.  (AR 73.)

15

16      The ALJ posed a second hypothetical:

17         [L]ift and carry is 20 occasionally, 10 frequently; stand and walk is six per day; postural
           limitations: stairs and ramps would be occasional; ladders, scaffolds, and ropes never;
18         and balance is frequent, stoop, crouch, kneel, and crawl are all occasional; attendance:
           will miss less than one per month; unscheduled breaks: there are none; and manipulative
19         limitations: all are frequent bilaterally, reaching, handling, and fingering; communication
           limitations of hearing, seeing, and speaking: there are none; environmental: I'm going
20         to say heights are less than occasional; unprotected heights; mental and emotional
           limitations: understanding, remembering - - let's see: short and simple; there are no
21         limits; carrying out short and simple instructions: no limits; understanding and
           remembering detailed instructions is slightly limited; carrying our detailed instructions
22         is slightly limited; making judgements about simple work relations is - - there are none;
           interacting appropriately with the public: there are none; interacting with supervisors is -
23         - there's none, and interacting with co-workers is none, but responding appropriately to
           work pressures is slightly limited, and responding appropriately to changes in the work
           place is slightly limited.

24

25  (AR 73-74.)  Mr. Morrell testified that under those hypothetical limitations, a person could perform

26  Ms. Huss's previous work as a case worker.  (AR 74.)  Ms. Huss's employment as a caseworker,

27  family (DOT 195.107-018) has a SVP of seven and is classified as "sedentary, skilled employment."

28  (AR 74-75.)  Even if Ms. Huss could not function at the SVP seven level, she had skills that could

United States District Court
For the Northern District of California

1  transfer to less strenuous positions.  (AR 75-76.)  Ms. Huss's experience as a case worker would

2  qualify her to be a case aide (DOT 195.367-010) which has a SVP of three or a social services aide

3  (DOT 195.367.034) which has a SVP of six.  (AR 75-76.)

4      Additionally, Mr. Morrell stated that with the limitations in hypothetical two, Ms. Huss could

5  perform jobs with openings in the regional, state, and national economy.  (AR 76-78.)  A job as a

6  hotel maid or housekeeper (DOT 323.687-010), with a SVP of two, had 108,000 openings in

7  California and ten times that nationally.  (AR 76-77.)  A job as a cashier (DOT 211.462-010), with a

8  SVP of two, had 42,000 in California and ten times that nationally.  (AR 76-77.)

9  **D.  The ALJ's Findings**

10      Applying the sequential evaluative process as discussed below, the ALJ held on June 14, 2012,

11  that Ms. Huss was not disabled under §§ 216(i) and 223(d) of the Social Security Act and therefore

12  not entitled to disability insurance benefits.  (AR 22.)  The ALJ also held that Ms. Huss was also not

13  disabled under § 1614(a)(3)(A) of the Social Security Act and therefore not entitled to supplemental

14  security income.  (AR 22-23.)

15      At step one, the ALJ found that Ms. Huss had not engaged in substantial gainful activity since

16  August 15, 2008, the alleged onset date.  (AR 16.)

17      At step two, the ALJ found that Ms. Huss had the following impairments: obesity, thoracic back

18  pain of unknown etiology, sleep apnea, and asthma.  (AR 16.)  The ALJ found those impairments to

19  be severe in combination and to cause more than minimal limitations on Ms. Huss's ability to

20  perform basic work activities.  (AR 16.)  The ALJ dismissed Ms. Huss's diabetes because it was

21  well controlled with medication and had not presented any complications or impairments.  (AR 17.)

22  Additionally, the other physical limitations, such as arthritis in the hands, blockage in her intestine,

23  right knee arthritis, migraines, lumbar disc problems, and a distant history of a neck fusion surgery,

24  are "generally not present in the objective medical evidence."  (AR 17.)

25      The ALJ further determined that the alleged mental impairments of depression and anxiety were

26  not supported by objective evidence because there was "little-to-no treatment, no outpatient care,

27  and no psychiatric hospitalizations."  (AR 16.)  The ALJ dismissed the depression diagnoses of both

28  Dr. Bonilla and Dr. Goldman because Ms. Huss did not present with any symptoms on the days of

1    the consultations.  (AR 17.)  He therefore accorded little weight to the limitations outlined in their

2    consultation reports.  (AR 17.)  Conversely, the ALJ did grant great weight to the Global

3    Assessment of Functioning (GAF) score of 63 from both Dr. Bonilla (AR 369) and Dr. Goldman

4    (AR 511), because those scores reflected the mild level of symptoms on those days.  (AR 17.)

5        Pointing to Ms. Huss's statements that she is able to perform a wide range of daily activities and

6    "the absolute lack of longitudinal treatment for any mental issues and essentially benign consultative

7    mental status evaluations," the ALJ determined that Ms. Huss did not have more than mild/slight

8    limitations in any area of mental functioning.  (AR17.)

9        At step three, the ALJ found that Ms. Huss did not have "an impairment or combination of

10   impairments that meets or medically equals the severity of any of the listed impairments."  (AR 17-

11   18.)  The ALJ then found that Ms. Huss has the residual functional capacity (RFC) to perform "light

12   work as defined in 20 CFR 404.1567(b) and 416.967(b)" with certain restrictions.  (AR 18.)  The

13   ALJ's restrictions were "no more than occasional climbing stairs and ramps; no climbing ladders,

14   ropes, or scaffolds; no more than frequent balancing; no more than occasional stooping, kneeling,

15   crouching, or crawling; the claimant will miss less than 1 day of work per month; no more than

16   frequent bi lateral gross or fine manipulation; and no exposure to unprotected heights or pulmonary

17   irritants."  (AR 18.)

18       In making this finding, the ALJ first considered Ms. Huss's symptoms and how consistent they

19   were with the objective medical evidence.  (AR 18.)  The ALJ then determined whether there was an

20   underlying medically-determinable physical or mental impairment that reasonably could be expected

21   to produce Ms. Huss's pain and symptoms and then evaluated the intensity, persistence, and

22   limiting effects of the symptoms to determine the extent that they limited Ms. Huss's functioning.

23   (AR 18.)  To the extent that Ms. Huss's statements about the intensity or functionally limiting effects

24   of pain or other symptoms were not substantiated by objective medical evidence, the ALJ made

25   findings on the credibility of the statements "based on a consideration of the entire case record."

26   (AR 18.)

27       The ALJ determined that Ms. Huss's BMI of 39.3 categorized her as having Level II obesity

28   under Social Security Ruling 02-1p.  (AR 18.)  Because there is no longer a listing for obesity, the

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

ALJ applied the criteria of the musculoskeletal, respiratory, and cardiovascular impairments under Listings 1.00Q, 3.00I, and 4.00F, respectively. (AR 18.) The ALJ found that Ms. Huss's obesity did not, "alone or in combination with any other impairment, medically equal[] the criteria of any listed impairment." (AR 18.)

In determining Ms. Huss's RFC, the ALJ relied heavily on her own reports that she has no problem taking care of herself and others, doing routine household chores, running errands, and playing with her grandchildren. (AR 19.) The ALJ cited to exhibits on pages 182, 201, and 209 of the administrative record as evidence of her continuing functionality. (AR 19.) The ALJ also pointed out that Ms. Huss did not stop working in August of 2008 because of a disability, but instead stopped working because the program lost funding for her position and laid her off. (AR 19.) Therefore the ALJ found Ms. Huss's "impairments could reasonably be expected to cause the alleged symptoms, however the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with" his assessed RFC. (AR 19.)

The ALJ found Ms. Huss's impairments of obesity, back pain with an unknown etiology, asthma/COPD, and sleep apnea to be supported by the objective medical evidence and assigned Ms. Huss a reduced light exertional level. (AR 21.) All other ailments that Ms. Huss alleged were not supported by the objective medical evidence. (AR 21.)

The ALJ gave no weight to a letter written by treating physician Dr. Brandt expressing concern that Ms. Huss might have colon cancer or multiple sclerosis (MS) and therefore could not work. (AR 20.) This assessment "was based on speculation without and signs or laboratory findings to support a definitive diagnosis for a disabling condition." (AR 20.) The ALJ also asserted that Ms. Huss hadn't seen Dr. Brandt since late 2009 which further eroded his view of the reliability of the assessment. (AR 20.)

The ALJ gave great weight to the assessment of examining physician Dr. Nguyen from May 2010. (AR 20.) Dr. Nguyen concluded that Ms. Huss had no exertional limitations and she should avoid exposure to pulmonary irritants. (AR 20.) The ALJ gave great weight to the pulmonary irritants limitation and found that, although the record at that time supported little-to-no exertional

1   limitations, "the record subsequent to the May 2010 assessment along with claimant's subjective

2   complaints warrant some exertional restrictions . . . ." (AR 20.)

3       The ALJ also accorded great weight to the testimony of non-examining physician Dr. Gordy

4   because his assessment was "based on a full review of the evidence from a psychiatric expert." (AR

5   21.) Dr. Gordy testified that the record revealed no objective evidence of a stroke during the period

6   at issue and the evidence on the record was "not significant enough to indicate a definitive diagnosis

7   related to mental health." (AR 21.)

8       The ALJ accorded no weight to the medical source statement provided by treating physician Dr.

9   Solorio in April 2011. (AR 21.) Dr. Solorio determined that Ms. Huss was limited to "less-than-

10  sedentary exertional level due to fatigue, degenerative joint disease, COPD, and hypertension." (AR

11  21.) The ALJ stated that Dr. Solorio had only been treating Ms. Huss for a couple of months and the

12  "contemporaneous treatment notes from these visits indicate virtually no significant issues." (AR

13  21.) Additionally, "many of the diagnoses related to this opinion were not supported by signs,

14  symptoms, and laboratory findings required for a medically determinable impairment." (AR 21.)

15      Finally, the ALJ accorded some weight, "with respect to acknowledging the fairly wide range of

16  daily activities performed by the claimant," to the non-medical statement from Ms. Huss's son from

17  March 2010. (AR 21.) This statement provided "special knowledge and/or insight into the severity

18  of the impairment(s) and functionality . . . ." (AR 21.)

19      At step four, the ALJ concluded that Ms. Huss is capable of performing past relevant work as a

20  case worker because the performance of that work falls within the definition of "light work" in the

21  regulations. (AR 21.) Based on the testimony of the vocational expert in response to the second

22  hypothetical, the ALJ concluded that, taking into account her RFC, Ms. Huss was "able to perform

23  the position of a case worker as actually performed and as generally performed." (AR 22.)

24      The ALJ did not address step five because he found Ms. Huss is able to perform past relevant

25  work at step four. The ALJ thus concluded the sequential process by stating that Ms. Huss "has not

26  been under a disability, as defined in the Social Security Act, from August 15, 2008, through the

27  date of this decision." (AR 22.)

28

UNITED STATES DISTRICT COURT
For the Northern District of California

**ANALYSIS**

Ms. Huss seeks an order remanding the case to the Commissioner with instructions to award and pay all disability benefits due her.  (Motion, ECF No. 13 at 1.)  In the alternative, Plaintiff requests a remand with instructions regarding proceedings on remand.  *Id.*  The Commissioner filed a cross-motion for summary judgement asking the court to affirm the denial of disability insurance and supplemental social security income.  (Motion, ECF No. 14 at 1.)

**I. LEGAL STANDARD**

    **A.  Standard of Review**

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the plaintiff initiates the suit within 60 days of the decision.  District courts may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole."  42 U.S.C. § 405(g); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  If the evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision.  *See id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).

    **B.  Applicable Law: Five Steps to Determine Disability**

An SSI claimant is considered disabled if (1) he suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(A) & (B).

The Social Security regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act.  *See* 20 C.F.R. § 404.1520.  The five steps are as follows:

**Step One.**  Is the claimant presently working in a substantially gainful activity?  If so, then the claimant is "not disabled" and is not entitled to benefits.  If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two.  *See* 20 C.F.R. § 404.1520(a)(4)(I).

**Step Two.**  Is the claimant's impairment (or combination of impairments) severe?  If not, the claimant is not disabled.  If so, the evaluation proceeds to step three.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).

**Step Three.**  Does the impairment "meet or equal" one of a list of specified impairments described in the regulations?  If so, the claimant is disabled and is entitled to benefits.  If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four.  *See* 20 C.F.R. § 404.1520(a)(4)(iii).

**Step Four.**  Considering the claimant's residual functional capacity, is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is not disabled and is not entitled to benefits.  If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.**  Considering the claimant's residual functional capacity, age, education, and work experience, is the claimant able to "make an adjustment to other work?"  If not, then the claimant is disabled and entitled to benefits.  *See* 20 C.F.R. § 404.1520(a)(4)(v).  If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do.  There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.  If the Commissioner meets this burden, the claimant is not disabled.

For steps one through four, the burden of proof is on the claimant.  At step five, the burden shifts to the Commissioner.  *See Tackett*, 180 F.3d at 1098.

## II. DISCUSSION

### A. The ALJ Gave Great Weight to the Opinion of Dr. Gordy, Whose Testimony Was Based on an Incomplete Record

The court first examines whether the ALJ improperly relied on the testimony of Dr. Gordy, a psychological expert who testified at the hearing but who did not examine Ms. Huss.  In her motion for summary judgement, Ms. Huss argues that the ALJ erred by according Dr. Gordy's testimony "great weight" when "he never saw some of the treatment records."  (Motion, ECF No. 13 at 6.)  The court agrees.  As was made clear at the administrative hearing, Dr. Gordy never saw Exhibit B31F, and that exhibit contains six months of treatment records from Dr. Solorio and Ms. Ritsema, including extensive psychological treatment notes.  (AR 34, 579-614.)  The ALJ accorded great weight to the testimony of Dr. Gordy "because it was based on a full review of the evidence from a

1    psychiatric expert" and because Dr. Gordy "had an opportunity to review the entire longitudinal

2    history of medical evidence." (AR 21.) The problem is that if Dr. Gordy did not review the

3    treatment records in Exhibit B31F. This is important because Dr. Gordy testified that "the limited

4    treatment consisting of a few consultative evaluations for mental impairments was not significant

5    enough to indicate a definitive diagnosis related to mental health" and concluded that the evidence

6    on the record was "not significant enough to indicate a definitive diagnosis related to mental health."

7    (AR 21.) But there actually appears to be a trove of evidence related to Ms. Huss's mental health in

8    the record; Dr. Gordy just did not see it. And if the fullness of Dr. Gordy's opinion regarding Ms.

9    Huss's mental health is called into question because he did not actually review all of the evidence,

10   then the ALJ's reason for giving Dr. Gordy' opinion great weight—"because it was based on a full

11   review of the evidence from a psychiatric expert" (AR 21)—is called into question, too.

12       The Commissioner unpersuasively tries to downplay this mistaken view that Dr. Gordy

13   considered all evidence by arguing that Exhibit B31F, which Dr. Gordy did not see, contains only "a

14   few routine office visits . . . that revealed some depression due to situational family stressors."

15   (Cross-Motion, ECF No. 13 at 7.) Exhibit B31F includes exam and treatment notes, test results, and

16   diagnoses from approximately six months of treatment Ms. Huss received at the Monterey County

17   Laurel Family Practice. (AR 579-614.) The notes in Exhibit B31F indicate that Ms. Huss

18   repeatedly visited Ms. Ritsema, a psychiatric nurse practitioner, for treatment of her depression.

19   (AR 587-88, 593-95, 596-99, 603-07.) In their first session, Ms. Ritsema diagnosed Ms. Huss with

20   "major depressive disorder, recurrent episode, moderate." (AR 603.) Ms. Huss also attended

21   counseling with Ms. Venegas, a licensed clinical social worker, to work on ways to cope with her

22   depression. (AR 600.) These are significant records, particularly when combined with all of the

23   other records from Ms. Huss's treatment with Dr. Solorio (AR 462-506).

24       It is important that the ALJ's reliance on Dr. Gordy be based on his consideration of all relevant

25   records, especially given the general rule that an ALJ "has a special duty to fully and fairly develop

26   the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d

27   441, 443 (9th Cir. 1983). This is not to say the ALJ make a mistake in considering Dr. Gordy's

28   opinion. It is just that the ALJ gave Dr. Gordy's opinion great weight based on his "full review of

UNITED STATES DISTRICT COURT
For the Northern District of California

1   the evidence," but that review was not in fact "full" because Dr. Gordy did not review a significant

2   number of the treatment records.  Thus, the action must be remanded on this issue.

3       **B.  The ALJ Did Not Consider All the Evidence Regarding Ms. Huss's Alleged Depression and Must Reconsider Whether Depression Should Be Included in Light of This Evidence**

4

5       Ms. Huss also argues that the ALJ failed to include her depression in his analysis of her

6   impairments.  (Motion, ECF No. 13 at 5.)  The ALJ gave three reasons for not including Ms. Huss's

7   depression: (1) "the absolute lack of longitudinal treatment" for depression, (2) the two GAF scores

8   of 63 from the consulting psychologists, and (3) the testimony of Dr. Gordy at the hearing.  (AR 16,

9   17, and 21.)  As for reasons (1) and (3), as stated in the previous section, Ms. Huss was treated for

10   depression longer, and there are more records concerning that treatment (in Exhibit B31F), than the

11   ALJ and Dr. Gordy thought.  And the court also found that the ALJ's crediting of Dr. Gordy's

12   opinion regarding Mr. Huss's depression was not supported because Dr. Gordy never saw the six

13   months of records in Exhibit B31F.  The court finds that reasons (1) and (3) thus are not supported

14   by the (actual) record.

15       This leaves reason (2).  The ALJ relied on the GAF scores of 63 from both consulting

16   psychologists, Dr. Bonilla and Dr. Goldman, to determine that Ms. Huss's depression was not

17   severe.  (AR 17.)  The ALJ, however, did not explicitly address the GAF score of 55 that Ms.

18   Ritsema assigned Ms. Huss on August 17, 2011.  (AR 606.)  This score was made after Ms. Ritsema

19   extensively examined with Ms. Huss, and Ms. Ritsema thereafter provided Ms. Huss with a

20   comprehensive treatment plan.  (AR 603-08.)  It is not clear that the ALJ considered the GAF score

21   of 55 and Ms. Ritsema's evaluation of Ms. Huss when he made his determination that Ms. Huss's

22   depression was not severe.  Especially given the issue regarding Exhibit B31F, the court finds it to

23   be appropriate to remand to consider all of the evidence regarding Ms. Huss's alleged depression in

24   his analysis of her impairments.

25       In reevaluating the severity of Ms. Huss's depression on remand, an issue is whether it has

26   gotten more severe over time.  The record includes no medical evidence that Ms. Huss was

27   depressed on August 15, 2008, the date she alleges her disability began.  The contemporaneous

28   treatment notes from Dr. Brandt never mention depression.  (AR 335-56.)  Additionally, the notes

UNITED STATES DISTRICT COURT
For the Northern District of California

1   from Ms. Huss's visit to Salinas Valley Memorial Hospital in July 2008 do not mention any

2   diagnosis or signs of depression.  (AR 294-333.)  Ms. Huss, in her motion for summary judgement,

3   mentions without citation that she has been taking Effexor for eight years.  (Motion, ECF No. 13 at

4   6.)  Nonetheless, when Ms. Huss filled out her Disability Report Form SSA-3368 (AR 182-193), she

5   listed the reason for taking Effexor to calm her anxiety and lower her stress, not to help her

6   depression.  (AR 190.)

7       The first medical evidence in the record of Ms. Huss's depression is Dr. Bonilla's diagnosis of

8   "major depressive disorder" in her consultative exam on May 9, 2010.  (AR 369.)  In that exam, Ms.

9   Huss reported that her depressive symptoms started in 2002, and they worsened since she was laid

10  off.  (AR 365.)  On May 12, 2011, Dr. Goldman diagnosed Ms. Huss with a "mood disorder due to a

11  general medical condition with depressive features."  (AR 511.)  Finally, the findings of Ms.

12  Ritsema and Ms. Venegas, including the GAF score of 55, might represent a worsening of the Ms.

13  Huss's depression.  (AR 606.)

14  **C.  Credibility of Opinions from Treating Physicians**

15      Ms. Huss additionally argues that the ALJ improperly disregarded the opinions of Dr. Brandt and

16  Dr. Solorio.  (Motion, ECF No. 13 at 10-12.)

17      When determining whether a claimant is disabled, the ALJ must consider each medical opinion

18  in the record together with the rest of the relevant evidence.  20 C.F.R. § 416.927(b); *Zamora v.*

19  *Astrue*, No. C 09-3273 JF, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010).  "By rule, the Social

20  Security Administration favors the opinion of a treating physician over non-treating physicians."

21  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527).  "The opinion of a

22  treating physician is given deference because 'he is employed to cure and has a greater opportunity

23  to know and observe the patient as an individual.'"  *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169

24  F.3d 595, 600 (9th Cir. 1999) (citing *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).

25  "However, the opinion of the treating physician is not necessarily conclusive as to either the

26  physical condition or the ultimate issue of disability."  *Id.* (citing *Magallanes v. Bowen*, 881 F.2d

27  747, 751 (9th Cir. 1989) and *Rodriguez v. Bowen*, 876 F.2d 759, 761-62 & n.7 (9th Cir. 1989)).  "If a

28  treating physician's opinion is 'well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight.'" *Orn*, 495 F.3d at 631(quoting 20 C.F.R. § 404.1527(d)(2)).

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given." *Id.* "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (citing 20 C.F.R. § 404.1527(b)(2)(i)-(ii)). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and '[o]ther factors' such as the degree of understanding a physician has of the [Social Security] Administration's 'disability programs and their evidentiary requirements' and the degree of his or her familiarity with other information in the case record." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)-(6)). Nonetheless, even if the treating physician's opinion is not entitled to controlling weight, it still is entitled to deference. *See id.* at 632 (citing SSR 96-02p at 4 (Cum. Ed. 1996)). Indeed, "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-02p at 4 (Cum. Ed. 1996).

"Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians." *Orn*, 495 F.3d at 631 (citing 20 C.F.R. § 404.1527(d)(1)-(2)); *see also* 20 C.F.R. § 404.1527(d). Accordingly, "[i]n conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJs weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Id.* (quotation and citation omitted). "If a treating or examining doctor's opinion is contradicted by

another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quotation omitted).[3]  Opinions of non-examining doctors alone cannot provide substantial evidence to justify rejecting either a treating or examining physician's opinion. *See Morgan*, 169 F.3d at 602.  An ALJ may rely partially on the statements of non-examining doctors to the extent that independent evidence in the record supports those statements. *Id.*  Moreover, the "weight afforded a non-examining physician's testimony depends 'on the degree to which they provide supporting explanations for their opinions.'" *See Ryan*, 528 F.3d at 1201 (quoting 20 C.F.R. § 404.1527(d)(3)).

Ms. Huss first argues that the ALJ improperly discounted the opinion of treating physician Dr. Elena Brandt.  (Motion, ECF No. 13 at 6-7.)  In a letter dated March 19, 2010, Dr. Brandt declares Ms. Huss to be "disabled because I have serious concerns about her health."  (AR 359.)  But she states that this conclusion was "not about orthopedic concerns or how long she can stand or sit." (AR 359.)  Rather, Dr. Brandt opines that Ms. Huss might have "colon cancer or MS."  (AR 359.) Dr. Brandt, however, admits that she had not performed a colonoscopy or brain MRI.  (AR 359.)

---

[3]  Although the type of reasons needed to reject either a treating or an examining physician's opinion is the same, the amount and quality of evidence in support of those reasons may be different. As the Ninth Circuit explained in *Lester*:

> Of course, the type of evidence and reasons that would justify rejection of an examining physician's opinion might not justify rejection of a treating physician's opinion.  While our cases apply the same legal standard in determining whether the Commissioner properly rejected the opinion of examining and treating doctors-neither may be rejected without 'specific and legitimate' reasons supported by substantial evidence in the record, and the uncontradicted opinion of either may only be rejected for 'clear and convincing' reasons-we have also recognized that the opinions of treating physicians are entitled to greater deference than those of examining physicians. *Andrews*, 53 F.3d at 1040-41; *see also* 20 C.F.R. § 404.1527(d).  Thus, reasons that may be sufficient to justify the rejection of an examining physician's opinion would not necessarily be sufficient to reject a treating physician's opinion.  Moreover, medical evidence that would warrant rejection of an examining physician's opinion might not be substantial enough to justify rejection of a treating physician's opinion.

*Lester v. Chater*, 81 F.3d 821, 831 n.8 (9th Cir. 1995).

UNITED STATES DISTRICT COURT
For the Northern District of California

As the ALJ concluded, there is no objective medical evidence to support these musings. The ALJ properly gave no weight to Dr. Brandt's opinions in this letter because those opinions were based on speculation and were made "without any signs or laboratory findings to support a definitive diagnosis for a disabling condition." (AR 20.) Additionally, the record indicates that Ms. Huss did get a colonoscopy in October 2011, but the results of that colonoscopy are not found anywhere in the record, and Ms. Ritsema's notes mention only that Ms. Huss felt "reassured the anesthesiologist was through." (AR 593, 596.)

Ms. Huss suggests that there is no medical evidence in the record to support Dr. Brandt's opinions because she could not afford the necessary medical treatment and points out that the Ninth Circuit has held that poverty is a legitimate reason for failing to seek medical treatment. (Motion, ECF No. 13 at 7) (citing *Reginetter v. Comm'r, Social Security Admin.*, 166 F.3d 1294, 1296-97 (9th Cir. 1999)). This is true, but here Ms. Huss did not stop seeking all medical treatment; she merely stopped seeking medical treatment from Dr. Brandt. Indeed, Ms. Huss continued to receive treatment from Dr. Solorio and Ms. Ritsema at the Laurel Family Practice, after terminating her visits with Dr. Brandt. (AR 462-506, 579-614.) Thus, given the lack of any medical evidence to support Dr. Brandt's opinions in the letter, the court concludes that the ALJ did not err by granting those opinions no weight.

Ms. Huss next argues that the ALJ improperly discounted the opinion of treating physician Dr. Solorio. (Motion, ECF No. 13 at 7.) Dr. Solorio stated in a medical source statement from April 2011 that Ms. Huss was restricted to less-that-sedentary exertion due to fatigue, degenerative joint disease, COPD, and hypertension. (AR 255-259.) The ALJ gave this opinion no weight because Dr. Solorio had "only seen the claimant a few times at that time." (AR 21.) While length of treatment is typically a factor that the ALJ can consider when determining the credibility of a medical source, 20 C.F.R. § 404.1527(b)(2)(i), Ms. Huss correctly points out that the ALJ did not bear in mind the additional treatment records from Dr. Solorio found in Exhibit B31F and the fact that Dr. Solorio remained Ms. Huss's physician at the time of the hearing. (Motion, ECF No. 13 at 8.)

The court agrees with Ms. Huss that remand on this issue is appropriate. "The ALJ in a social security case has an independent duty to fully and fairly develop the record and to assure that the

1   claimant's interests are considered." *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001)

2   (quoting *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996)) (internal quotation marks omitted).

3   This duty applies even where the claimant is represented and is triggered where the evidence is

4   ambiguous, or where the ALJ finds that the record is inadequate to allow for proper evaluation of the

5   evidence. *Hadera v. Colvin*, C-12-5315 EMC, 2013 WL 4510662, at *4 (N.D. Cal. Aug. 22, 2013)

6   (citing *Tonapetyan*, 242 F.3d at 1150.). "An ALJ is required to recontact a doctor only if the

7   doctor's report is ambiguous or insufficient for the ALJ to make a disability determination." *Bayliss*

8   *v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005). "A specific finding of ambiguity or inadequacy of

9   the record is not necessary to trigger this duty to inquire, where the record establishes ambiguity or

10  inadequacy." *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011)

11      On remand, the ALJ should take into consideration both the evidence in Exhibit B31F and any

12  update from Dr. Solorio (given that he remained Ms. Huss's treating physician at the time of the

13  ALJ's decision) and thereby fully develop the record.  20 C.F.R. §§ 404.1520b(c)(1).

14      **D.  The ALJ Should Reevaluate Ms. Huss's Credibility Based on a Review of the Entire Record**

15      Ms. Huss argues that the ALJ improperly discounted her credibility and found her only partially

16  credible.  (Motion, ECF No. 13 at 12.)  She says that ALJ did this in part because the ALJ found that

17  her claims of impairment were not supported by substantial evidence and was erroneous.  (Motion,

18  ECF No. 13 at 8.)  Given the inadvertent failure to consider Exhibit B31F and the resulting

19  insufficiency of the record, on remand the ALJ should reevaluate Ms. Huss's credibility after

20  considering the evidence in Exhibit B31F.

21      **E.  Remand is the Appropriate Remedy in this Case**

22      Ms. Huss argues that there is no need for remand because the record is complete with the

23  Vocational Expert's testimony based in the opinion of Dr. Solorio.  (Motion, ECF No. 13 at 8, 9.)

24  The court does not agree.  Given the insufficiency of the fact record, remand is appropriate.

25                                      **CONCLUSION**

26      For the foregoing reasons, the court denies in part and grants in part Ms. Huss's motion and

27  denies the Commissioner's motion.  The court remands this case to the Commissioner for further

28

proceedings consistent with this order.

This disposes of ECF Nos. 13 and 14.

**IT IS SO ORDERED.**

Dated: April 14, 2015

_____
LAUREL BEELER
United States Magistrate Judge